**WARNOCK v
YOUNGSTOWN BAG & BURLAP CO**

Ohio Appeals, 7th Dist, Mahoning Co

Decided Nov 4, 1932

Nicholson & Warnock, Youngstown, for plaintiff in error.

Barnum, Hammond, Stephens & Hoyt, Youngstown, for defendant in error.

POLLOCK, J.

This was in the afternoon of that day, probably about five o'clock. The streets were not wet or slippery and the accident occurred as we have stated. The first error complained of was in the admission of evidence. Carl Olson was called by the plaintiff and testified that he was commissioner of traffic of the city of Youngstown, and was familiar with the ordinances and the

streets and so forth, and had more or less charge of them. After some questions in regard to this sign or notice that we have spoken of in Belmont Avenue, he was asked:

Q. Why did you have the sign there placed with the word 'stop,' on the street?

There was objection made and sustained and then the plaintiff set out what she expected the witness would testify. The record shows:

"If the witness were permitted to answer, he would testify and say that the sign and the stop sign was placed there in pursuance with the provisions of law both as to the city ordinance and the statute, giving the traffic department of a municipality the right to regulate traffic, and in pursuance of that right and the fact that West Federal Street is a main thoroughfare, the sign on the street and the sign at the side on the post was for the purpose of regulating traffic and requiring traffic coming from Belmont Avenue and entering into Federal Street to come to a dead stop."

The question, in the first place, "Why did you have that sign there placed with the word 'stop' on the street," it was not for this officer to say why the sign was placed in the street. Anyone coming down the street would know why it was placed there, and the answer plaintiff expected to receive was only this man's opinion of the law and what ought to be done. The sign was ordered by the city. There was no error in the court not permitting this question to be answered.

The next error complained of is in the charge. The court had permitted the ordinance of the city of Youngstown to be introduced in evidence. By the time the case got to the charge the court had changed his opinion, because he felt that the requirements of §6310-32 GC had not been complied with by the city, so as to make the ordinance which the city had passed, requiring travelers to stop at this sign, effective; in other words, that the city had not complied with the provisions of the Code. He took from the consideration of the jury this ordinance, and further, on probably pages 212 and 213, he again referred to the stop sign and said the only purpose it served was in determining what would be ordinary care as a party approached on Belmont Avenue to Federal Street. After that charge he then charged the statutory rule as interpreted by the

Supreme Court in the case of **Heidle v Baldwin, 118 Oh St, 375.** This is urged on the part of the plaintiff in error and the other party claimed it was not error, and each party appeals to this case that we have just now referred to as sustaining their proposition. Plaintiff claims that in §7 of the syllabus, the court announces the rule that a city having such an ordinance requires the party to stop and it is actionable if an accident occurs by the failure to do so. The defendant claims that the question we have was not before the Supreme Court. A reading of the facts stated in the opinion would show that the municipality in which that accident had occurred had complied with the provisions of the statute, so that the question we have in this case was not before the Supreme Court.

Our attention has been called to the Court of Appeals case in the 30 Oh Ap, and to one in the 32 Oh Ap. We do not think either of those cases assist in determining the question that we have in this case. It must be determined from a construction of the provisions of this section, §6310-32 GC. It is probably well enough to refer to the three sections which announced the statutory rule, and then §6310-32 GC has reference to the modification or change that may be made by the city. §6310-30 GC reads:

"For the purpose of enforcing the road regulations referred to in this chapter, the main thoroughfare shall be understood to mean all sections of public roads and highways on which street cars or electric cars run, and also all main market and inter-county highways within the state."

So it must be conceded that Federal Street was a main thoroughfare of this city. §6310-31 GC reads:

"Vehicles and street cars going on main thoroughfares shall have the right of way over those going on intersection thoroughfares."

Sec 6310-28 GC defines right of way:

"Right of way means the right of a vehicle to proceed uninterruptedly in a lawful manner in the direction in which it is moving in preference to another vehicle approaching from a different direction into its path."

Sec 6310-32 GC reads:

"Local authorities shall have the right to designate by ordinance or resolution additional main thoroughfares and to designate what vehicles shall have the right of way at intersections of main thoroughfares; provided, however, that legible and appropriate signs be erected not nearer than 100 feet from the intersection along all roads and highways intersecting such main highways."

This section refers to streets in cities like Federal Street in Youngstown. It was necessary in order for the city to provide rules and regulations for the entry of traffic on Federal Street to place a sign not less than 100 feet from the intersection. It is not claimed that the city had done that. It had placed this stop sign something like 20 feet back in the street and there was some sign on the side of the street, (we have not been able to learn how far back or where it was), which notified vehicles to stop, but it is not claimed it was 100 feet or more from the intersection. It is claimed that this provision allowing cities to control by placing signs 100 feet back only refers to main highways made so by ordinance of the city and not by main highways made so by the statute, and that Federal Street is a main thoroughfare by the statute, so that we will examine the first part of this section again, "Local authorities shall have the right to designate by ordinance or resolution additional main thoroughfares," so that there can be no doubt but what a city can designate main thoroughfares which are not made so by the Code proceedings, then the section says: "and to designate what vehicles shall have the right of way at intersections of main highways." In other words, this latter part of this sentence gives the city the right to designate what vehicle shall have the right of way at intersections of main thoroughfares, not main thoroughfares such as are made by former expression of this sentence, but main thoroughfares, so that we think a city's right to designate or change the statutory rule provided by the former section depends upon their compliance with the further provision of this section, and that it includes all main thoroughfares. Coming to that conclusion, the Court of Common Pleas was not in error in withdrawing this ordinance from the jury, for the reason as we have stated, and the charge then as given was, as we think, correct.

There is another error complained of in the charge, and that is the petition alleged that the defendant did not have the brakes on his truck in proper condition. The charge of the court, which was virtually that he should use ordinary care in having the brakes on the truck in ordinary condition or ordinarily safe, did not charge the statute correctly, that it was the owner's duty under this section to have the brakes properly and reasonably safe. There is no evidence that the employe of the defendant, Kelly, did as he approached this crossing, that the brakes had anything to do with his being where he was or in causing the accident. He testifies that he did stop before he came to this sign and then he started on. He does not make any claim that he tried to stop after that. He drove right on, but there is evidence, and that is the claim in this case, that after this accident, and probably in three minutes after the accident, Mrs. Warnock interviewed the witnesses, and Mrs. Morgan, riding with her, and some other person, that he made some remark that the brakes were not in condition. There is objection to all this evidence and the court let it in over that objection. The question is, was it part of the res gestae? This man operating the truck was not placed in charge of seeing after the brakes or apparently had no charge over the brakes. His remarks about the condition of the brakes could not be introduced in evidence unless it was part of the res gestae. Unless the person making such statements had authority to bind his principal the statement must be made as part of the res gestae. This was not an involuntary expression or expression made by this party just at the time of this accident, but it was made upon inquiry by a third person after the accident was over. We do not think that it was part of the res gestae.

This same question was determined by the Circuit Court in the case of **Cincinnati Traction Company v Jamison**, 13 O.C.C., (N.S.), 110:

"What a motorman said immediately after the accident, not voluntarily and spontaneously, but in answer to questions by witnesses of the accident as to why he did not stop the car, is not a part of the res gestae and therefore not admissible in evidence."

The same question was before the Circuit Court in **Cincinnati Interurban Company v Haines**, 8 O.C.C., 47. A somewhat kindred

question, only that the answer was made by the party injured, was before the Supreme Court in the case of **Cleveland, Columbus & Cincinnati Railway Co. v Mara, 26 Oh St, 185.** The injured party was thrown into a ditch in some way, and as they were helping him out of the ditch he made an expression about how he was injured. The Supreme Court held that the remark of the injured party was not part of the res gestae and it was incompetent. We think there was no competent evidence in this case requiring the court to make the charge that he did make. We will not stop to determine whether the part of the charge in question was correct or not. It was not prejudicial to the rights of the plaintiff in error.

We come now to the further error complained of and that is that the verdict of the jury was manifestly against the weight of the evidence. Mr. Kelly was called as a witness, the employe of the defendant who was operating this truck at the time of the accident. He testifies that he came south on Belmont Avenue and stopped about twenty feet back of the stop notice behind another truck. The stop notice was some fifteen or twenty feet north of the north line drawn across Belmont Avenue, to indicate where pedestrians should travel. The witness also testifies that the strip designated for pedestrians to walk was about six feet wide, and there is other testimony to that effect on the part of both parties. The collision occurred just slightly north of the north rail of the electric car line on Federal Street. The witness says that the other truck moved on, that he remained a short time, that he saw the plaintiff in her automobile on Federal Street, and as he thought was turning to go up Belmont Avenue. He started on in low gear and continued. He testified that when he started he was something like sixty feet from the place of the accident. He also testified that Belmont Avenue was about seventy feet wide. That is probably something near the width. He says that his automobile at the time he stopped was about ten feet from the west curb, which would make the automobile extend over near to the center of the west half of Belmont Avenue. He testified that he started in low gear and continued in low gear, and that he was watching the Warnock automobile. When he got to the point where we have indicated that this accident occurred, the plaintiff's automobile struck the front end of his truck. The plaintiff and Mr. Morgan testify that the truck struck

the front end of the automobile.

Just referring to a few questions, Mr. Kelly was called by the defendant and examined in chief and examined by cross examination. There is little difference in his testimony between his examination in chief and his cross examination, except that he is more specifically examined on cross examination and he refers to the facts more particularly in that examination. Referring to just a few questions:

"Q. You were back at least 60 feet away from the point of the collision. Now, did you keep your eye on her all the time?
A. Yes, I was watching her."

And when the witness refers to "her," he means to Eleanor Warnock's automobile.

"Q. From the time you first saw her until the time of the collision?
A. Sure, was watching her.
Q. Did she slow down any at all?
A. Sure, she slowed down some.
Q. How much did she slow down?
A. I don't know exactly. She was not going very fast when we had the collision."

He testified the first he saw this automobile it was indicating turning up Belmont.

"Q. You don't mean to tell this jury that she pulled up Belmont and made a circle?
A. I didn't say into Belmont, but she made a circle to go up Belmont. She was not going up straight up Federal.
Q. She was going in a southerly direction when the truck and her Ford came together, was she?
A. Yes, she was in a circling direction then."

Then he is asked if he blew his horn and he answered that he did. In the record he says she attempted to pull in in front of him, some expression of that kind. The sections of the Code as to what a party shall do in entering a main thoroughfare, and under the rules announced in Heidle v Baldwin, supra, second syllabus:

"The statute only applies where two vehicles are approaching the crossing from different directions so nearly at the same time and at such rates of speed within lawful limits that if each proceeds without regard to the other a collision is reasonably to be apprehended.

Where the driver of an automobile upon

an intersecting highway reaches a main thoroughfare, it is his duty to look both to the right and left, and if another vehicle is approaching the intersection on the main thoroughfare, it is his duty to wait until such other vehicle has passed before entering the intersection, unless a prudent person would have reasonable ground to believe that such other vehicle proceeding at a lawful speed is so far distant from the intersection that he could safely cross in advance thereof."

At the time the driver of this truck saw the automobile it was entering the intersection and he was sixty feet away from the collision. He says he thought at that time she was going up Belmont, but afterwards he said no, she did not go up Belmont, she made a circle on Federal Street. He says he was watching her all the time, from the time he started until this collision. It can not be said that the driver of this truck when he saw the automobile, that she was so far away that he had reasonable grounds to believe that he could cross in safety, and he had to cross Federal Street to get to the south side of it. Both machines were about the same distance from Federal Street. Mrs. Warnock was going at a reasonabe rate of speed, but faster than Kelly claims to have been going.

We think from the testimony of the operator of the truck that this verdict as to the negligence of the defendant can not be sustained, because Kelly says he saw the Warnock car enter the intersection on Federal Street. Suppose she did not drive in exactly a straight line. He said he knew she was not going up Belmont. Then he knew she was going to continue on Federal Street. The statute gave Mrs. Warnock the right of way and he had no right to cross unless he had reasonable ground to believe that he could cross in safety in front of the Warnock car. He could not have reasonable ground to believe that from the position in which he places himself and the automobile when he first saw it crossing the intersection of Belmont Avenue. So far as the negligence of the defendant is concerned, this verdict, we think, is against the weight of the evidence.

Perhaps there should be something said that the jury might, if there was some evidence, have found that Eleanor Warnock was guilty of negligence. She says that she saw the truck coming down Belmont, saw the man holding out his hand and he was slowing up. She says at that time there was traffic going west on Federal Street

and that an automobile had pulled out to the north of the traffic, as she thought intending to turn up Belmont Avenue, and that her attention was attracted to this party to such an extent that when she next looked she was so close to the defendant's truck that she could not entirely stop her automobile. She had a right to rely on the operator of the truck obeying the statutory rule. We think the verdict on the negligence of the defendant is manifestly against the weight of the evidence, and for that reason alone the judgment of the court below is reversed.

FARR and POLLOCK, JJ, concur in the judgment.